**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CURALEAF HOLDINGS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NEW JERSEY CANNABIS REGULATORY COMMISSION, *et al.*,<br><br>Defendants. | Civil Action No. 25-16397 (MAS) (RLS)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon two motions: (1) Plaintiffs Curaleaf Holdings, Inc. and Curaleaf NJ, II, Inc.'s (collectively, "Curaleaf" or "Plaintiffs") Motion for an Order to Show Cause and Preliminary Injunction against Defendants New Jersey Cannabis Regulatory Commission (the "Commission"), Chair Diana Houenou ("Houenou"), Commissioners Krista Nash ("Nash") and Amelia Mapp[1] ("Mapp"), and Acting Executive Director Christopher Riggs ("Riggs"), in their official capacities (collectively, "Defendants") (the "PI Motion") (ECF No. 23); and (2) Defendants' Motion to Dismiss[2] (ECF No. 39) Plaintiffs' Complaint (ECF No. 1). Plaintiffs opposed Defendants' Motion to Dismiss and replied to the PI Motion (ECF No. 42) and Defendants subsequently replied (ECF No. 43). Thereafter, both Plaintiffs and Defendants filed notices of supplemental authority and responses to the opposing parties' notices. (ECF Nos. 44-47,

---

[1] The Court notes that the docket reflects an incorrect spelling, "Ameila Mapp," which was used in Plaintiffs' Complaint. (*See* Compl., ECF No. 1.)

[2] Defendants' Motion to Dismiss also serves as their opposition to Plaintiffs' PI Motion. (*See* Defs.' Mot. to Dismiss, ECF No. 39.)

49-50.) The Court held oral argument on the motions on April 2, 2026. (*See* ECF No. 53.) Following oral argument, Defendants filed another notice of supplemental authority (ECF No. 51) and Plaintiffs filed a response (ECF No. 52). For the reasons below, the parties' motions (ECF Nos. 23, 39) are denied.

## I.   **BACKGROUND**[3]

### A.   **The Parties**

This matter relates to New Jersey's licensing and regulation of the cannabis industry. (*See generally* Compl.) The Commission is the New Jersey agency that, "[a]mong other things, . . . grants or denies licenses to operate adult-use cannabis businesses."[4] (*Id.* ¶ 19.) Curaleaf is a cannabis provider that "operates cannabis facilities in multiple states, including New Jersey" and has "operations [that] include facilities providing medicinal and adult-use cannabis." (*Id.* ¶ 18.) Curaleaf operates three licensed adult-use facilities in New Jersey, employing 195 full-time and 41 part-time employees. (*Id.*) Each of the New Jersey facilities is licensed by Defendants. (*Id.*)

### B.   **The New Jersey Cannabis, Regulatory, Enforcement Assistance, and Marketplace Modernization Act (the "CREAMM Act")**

"In 2020, New Jersey voters approved a voter initiative . . . which legalized adult-use recreational cannabis" and authorized the Commission "to 'oversee' the new market." (*Id.* ¶ 22.)

---

[3] For the purpose of considering Defendants' Motion to Dismiss, the Court accepts all factual allegations in the Complaint as true and considers exhibits attached to the Complaint and matters of public record. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (noting that the court can "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents" on a Rule 12(b)(6) motion (citation omitted)).

[4] The Commission is headed by three individuals: (1) Houenou, the Commission's Chair; and (2) Nash and Mapp, the Commissioners. (Compl. ¶¶ 19-20.) Riggs, the Acting Executive Director of the Commission, acts in his official capacity as the Commission's chief administrative officer and is "responsible for carrying out the Commission's decisions and orders." (*Id.* ¶ 21.)

The next year, the New Jersey State legislature passed the CREAMM Act, which among other things, "required all adult-use cannabis businesses to obtain a license." (*Id.* ¶ 23 (citing A.B. 21, 219th Leg., Reg. Sess. (N.J. 2020)).) Pursuant to the CREAMM Act, the Commission is assigned licensing authority and is tasked with considering certain conditions when granting licenses. (*Id.* ¶ 25.) "Licenses come in several forms[,]" including the most common form, an annual license subject to renewal each year. (*Id.* ¶ 24.) If the license is not renewed, the license holder cannot continue to operate. (*Id.* (citing N.J. Stat. Ann. § 24-6I-36).)

As part of its licensing scheme, New Jersey: (1) requires cannabis businesses to sign labor peace agreements (the "LPAs") with labor unions; (2) limits the unions with which those businesses can sign an LPA; and (3) requires the cannabis businesses to negotiate a collective bargaining agreement (the "CBA") with the union within 200 days of opening. (*Id.* ¶ 1 (citing N.J. Stat. Ann. § 24:6I-36.c).) "Under the LPA requirement, when a business applies for most cannabis licenses, it must submit an attestation from a 'bona fide labor organization' stating that the labor organization and the business have an LPA." (*Id.* ¶ 26.) The business is then required to "abide by and maintain" that LPA as an "ongoing and material condition" of the license. (*Id.*) If the cannabis business "violates the LPA or allows [it] to lapse, [its] license could be suspended, revoked, or not renewed." (*Id.*) With respect to the CBA requirement, "the business must enter 'or make a good faith effort to enter' a CBA within 200 days of opening a licensed cannabis establishment." (*Id.* ¶ 27.) If the business fails to do so, its license could be suspended or revoked. (*Id.*)

The CREAMM Act does not define "good faith effort," "collective bargaining agreement," or "labor peace agreement." (*Id.* ¶ 28 (citing N.J. Stat. Ann. § 24:6I-33 (definitions)).) It does, however, define "bona fide labor organization" and requires that "[t]o qualify, a labor organization must be one in which employees participate and that exists in whole or in part to 'collectively

bargain[] or otherwise deal[] with medical or personal use cannabis employers concerning grievances, labor disputes, and terms or conditions of employment.'"[5] (*Id.* ¶ 29 (alterations in original) (quoting N.J. Stat. Ann. § 24:6I-36.c).)

### C.    Cannabis Labor Market and LPAs in New Jersey

"[E]stablished unions have dominated the New Jersey cannabis labor market[,]" including the "[m]ost prominent" among those unions, United Food and Commercial Workers and its Local 360 (collectively, "UFCW," "Local 360," or the "Union"). (*Id.* ¶ 31.) According to Curaleaf, "UFCW markets itself as 'the Cannabis Workers' Union' for New Jersey" and advertises that it has "signed 'hundreds' of LPAs in New Jersey alone." (*Id.* ¶ 32.) "Local 360's website describes the terms an LPA must include[,]" namely that the LPA "must 'ensure that the employer stays neutral during a union organizing campaign'" and, "[i]n exchange, the LPA requires a union 'to refrain from any activity that can hurt the employer economically.'" (*Id.*) The Union requires that its LPAs contain certain terms, such as those to:

> (a) require employers to stay neutral to union organizing[;] (b) forbid the employer from making "negative statements" about the union[;] (c) require the employer to give the union access to its premises during work time[;] (d) allow the union to designate any potential bargaining unit[;] (e) require the employer to give the union employees' contact information[;] (f) require the employer to announce its neutral stance to employees in an open meeting[;] and

---

[5] The labor organization may also be "characterized" by certain criteria:

> (a) being a party to one or more [CBAs] with a cannabis employer; (b) having a written constitution for the prior three years; (c) filing annual financial reports with the U.S. Department of Labor in accordance with federal law; (d) filing at least one audited report in three of the last four years; (e) being affiliated with a regional or national association of unions; [or] (g) [*sic*] being a member of a "national labor organization that has at least 500 general members in a majority of the 50 states of the United States."

(Compl. ¶ 30 (citing N.J. Stat. Ann. § 24:6I-36.c).)

> (h) [*sic*] require the employer to recognize the union based on a showing of signed authorization cards

(the "Standard LPA Terms"). (*Id.* ¶¶ 33, 35.) Curaleaf alleges that such Standard LPA Terms "have become standard in New Jersey's cannabis industry," despite being "uncommon in other industries[.]" (*Id.* ¶ 35.) Moreover, the Union's LPAs "regularly require disputes to be resolved through binding arbitration" and "forbid the employer from asserting its rights before the [National Labor Relations Board (the 'NLRB')] or a court." (*Id.* ¶ 34.)

### D.    Curaleaf's Licenses and LPA

Curaleaf holds annual licenses covering four separate New Jersey facilities in Edgewater Park, Bordentown, Winslow, and Bellmawr (the "Facilities"). (*Id.* ¶ 36.) It has held these licenses since 2022, and all of them are subject to annual renewal. (*Id.*) In order to initially qualify for each license, "Curaleaf was required to negotiate and sign an LPA with a bona fide labor organization." (*Id.* ¶ 37.) Curaleaf did so with the Union on April 6, 2022. (*Id.*)

To negotiate the LPA, Curaleaf "had to waive" certain rights it claims were available to it under the National Labor Relations Act (the "NLRA"), including those contained in certain Standard LPA Terms. (*Id.* ¶ 38 (citing Ex. A to Compl. (the "LPA"), ECF No. 1).) Curaleaf represents that it "did not want any of these terms" and that, "[h]ad it been free to negotiate, it would not have accepted any of them" and would not have signed an LPA at all. (*Id.* ¶ 39.)

After signing the LPA, Local 360 organized Curaleaf's employees in its Facilities. (*Id.* ¶ 41.) In accordance with the LPA's terms, Curaleaf recognized the Union "based on a showing of signed authorization cards" and did not hold any secret-ballot elections in the Facilities. (*Id.*) In October 2022, the Union asked to begin bargaining with Curaleaf for a CBA. (*Id.* ¶ 42.) Curaleaf and the Union reached an agreement, but that agreement was rejected by the employees when sent to them for ratification. (*Id.*)

In anticipation of the LPA's expiration in April 2025, Curaleaf contacted the Union to ask about extending the LPA. (*Id.* ¶ 43.) The parties, however, were unable to agree to terms and the LPA expired without being renewed. (*Id.*) On April 22, 2025, William Wallace, the Director of Labor Compliance and Education for the Commission, sent e-mail correspondence to Curaleaf indicating that: (1) he was informed that Curaleaf's LPA expired; (2) "the LPA was a continuing and material term of Curaleaf's license"; and (3) Curaleaf was required "to provide 'proof, through written verification of a mutual extension of the LPA.'" (*Id.* ¶ 44 (quoting Ex. F to Compl. (Not. from Comm'r), ECF No. 1).)

On May 6, 2025, the Commission issued a Notice of Violation to Curaleaf (the "Violation Notice"), stating that the LPA had expired and that "[m]aintenance of an LPA with a bona fide labor organization is an ongoing condition for any licensed cannabis business." (*Id.* ¶ 45 (quoting Ex. G to Compl. (Not. of Violation), ECF No. 1).) The Violation Notice indicated Curaleaf's noncompliance with the LPA requirement from April 6, 2025, through May 6, 2025, and required Curaleaf to: "(1) remedy the violation within twenty . . . business days of receiving the notice; and (2) provide written confirmation to the Commission, postmarked within the same twenty . . . business-day period, detailing the corrective actions taken." (*Id.* ¶ 46.) In the Violation Notice, the Commission also "reserved the right to impose sanctions on Curaleaf" for its noncompliance with the regulations. (*Id.*)

On August 25, 2025, the Commission sent a Notice of Enforcement Action (the "Enforcement Notice") to Curaleaf, imposing a civil monetary payment of $610,000[6] due to Curaleaf's:

---

[6] The Enforcement Notice indicated that "Curaleaf had operated a licensed cannabis business for 122 days without an LPA[ and that t]he Commission had voted to [assess] a fine of $5,000 per day for noncompliance[,]" which totaled to the $610,000 fine amount. (Compl. ¶ 48.)

6

> (1) failure to maintain an LPA as an ongoing material condition of a business' license or permit; (2) failure to provide a new and executed LPA or advise the Commission that an existing agreement . . . had been renewed or extended; (3) failure to provide written verification of a mutual agreement by Curaleaf and another bona fide organization; (4) . . . response to the [Violation Notice] on June 2, 2025[,] admitting that it did not have a valid LPA with a bona fide organization; and (5) . . . failure to maintain an LPA as required by New Jersey law.

(*Id.* ¶ 47 (citing Ex. H to Compl. (Not. of Enforcement), ECF No. 1).) "[O]n September 28, 2025, in response to Curaleaf's application to renew its annual license for its Bordentown facility, the Commission provisionally granted the license application, but did so only upon [the condition] that Curaleaf secure an LPA for the facility on or before October 31, 2025." (*Id.* ¶ 50.)

### E.    Procedural Background

On October 9, 2025, Curaleaf filed its Complaint against Defendants, alleging that "Defendants cannot lawfully enforce the LPA requirement against Curaleaf" because "[t]he LPA requirement regulates activity that is[:] (a) arguably protected under the [NLRA;] (b) arguably prohibited by the NLRA[;] and (c) left intentionally unregulated by the NLRA[, and] is therefore preempted and cannot be enforced against Curaleaf." (*Id.* ¶ 3 (citations omitted).) In their Complaint, Curaleaf seeks declaratory and injunctive relief. (*See generally id.*) On October 24, 2025, Curaleaf filed the PI Motion seeking emergent relief preventing Defendants from withholding a license from Curaleaf. (*See generally* Prelim. Inj. Mot. ("PI Mot."), ECF No. 23.) On October 29, 2025, the Court held a telephone conference to discuss the PI Motion. (*See* Oct. 29, 2025, Text Order, ECF No. 28.) That same day, Defendants filed correspondence agreeing to "voluntarily stay the October 30, 2025[,] expiration of the Plaintiffs' Bordentown license pending the adjudication of Plaintiffs' [PI Motion]." (Defs.' Oct. 29, 2025, Correspondence 1, ECF No. 29.) On November 17, 2025, Defendants filed their Motion to Dismiss, which also addressed arguments in opposition to Plaintiffs' PI Motion. (*See generally* Defs.' Mot. to Dismiss; Defs.'

7

Moving Br., ECF No. 39-1.) Plaintiffs opposed the Motion to Dismiss and included arguments in reply and in support of their own PI Motion. (*See generally* Pls.' Opp'n Br., ECF No. 42.) Defendants subsequently replied. (*See generally* Defs.' Reply, ECF No. 43.) Thereafter, both parties filed notices of supplemental authority and correspondence explaining why the opposing parties' authority was inapplicable to the present matter. (*See generally* Pls.' Jan. 8, 2026, Not. of Supp. Auth., ECF No. 44; Defs.' Jan. 8, 2026, Correspondence, ECF No. 45; Defs.' Feb. 5, 2026, Not. of Supp. Auth., ECF No. 46; Pls.' Feb. 6, 2026, Correspondence, ECF No. 47; Pls.' Mar. 13, 2026, Not. of Supp. Auth., ECF No. 49; Defs.' Mar. 17, 2026, Correspondence, ECF No. 50.) The Court held oral argument on the parties' motions on April 2, 2026. (*See* Minute Entry, ECF No. 53.) Following the oral argument, Defendants filed another notice of supplemental authority (Defs.' Apr. 3, 2026, Not. of Supp. Auth., ECF No. 51) and Plaintiffs filed a response (Pls.' Apr. 8, 2026, Response to Defs.' April. 3, 2026, Not., ECF No. 52).

## II.    LEGAL STANDARD

### A.    Motion to Dismiss

Federal Rule of Civil Procedure[7] 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must identify "the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675

---

[7] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

(2009). Second, the court must identify all of the plaintiff's well-pleaded factual allegations, accept them as true, and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court can discard bare legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Third, the court must determine whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

### B.    Motion for a Preliminary Injunction

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). A preliminary injunction or temporary restraining order may be granted only if a plaintiff establishes that: (1) "[it is] likely to succeed on the merits of [its] claims"; (2) "[it is] likely to suffer irreparable harm without relief"; (3) "the balance of harms favors [it]"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted). The "plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citation omitted).

9

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (citation omitted); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." (citation omitted)).

## III.    DISCUSSION

The parties bring two separate motions concerning whether New Jersey's state law requiring an LPA and CBA should be allowed as an ongoing material condition of licensure for a cannabis business in New Jersey: (1) Defendants' Motion to Dismiss (*see generally* Defs.' Mot. to Dismiss); and (2) Plaintiffs' PI Motion (*see generally* PI Mot.). The Court first turns to Defendants' Motion to Dismiss before addressing Plaintiffs' PI Motion.

### A.    Defendants' Motion to Dismiss

Defendants move to dismiss the Complaint in its entirety on two grounds: (1) "the equitable doctrine of unclean hands bars Curaleaf from using federal equity to rewrite a state licensing regime so it can operate more freely in a market that federal law declares criminal"; and (2) the Court should abstain in light of ongoing state proceedings. (Defs.' Moving Br. 1.) For the reasons discussed below, the Court denies Defendants' motion.

10

### 1.     *Unclean Hands*

Defendants first contend that Plaintiffs' claims should be dismissed because "this Court should not use its equitable authority to enjoin the very state licensing safeguards that Curaleaf must satisfy to operate in a federally unlawful market." (*Id.* at 13; *see also* Defs.' Reply Br. 5-6 (arguing that "Curaleaf asks this Court to exercise its equitable authority to remove a condition of licensure so that the company may continue operating a business Congress has declared illegal").) Plaintiffs disagree, arguing that the unclean hands doctrine is "narrower than Defendants say" and "does not bar a court from granting relief to any plaintiff who has allegedly committed some collateral or unrelated wrong in another context."[8] (Pls.' Opp'n Br. 1-2.) Rather, Plaintiffs contend that the relief they seek is from the "unlawful conditions imposed on [them] by a state" and not a "benefit from [their] own closely[-]related wrongdoing[.]" (*Id.* at 4.)

"The unclean hands doctrine is 'derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge.'" *Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147, 149-50 (3d Cir. 2019) (quoting *Gaudiosi*, 269 F.2d at 882). "As an equitable doctrine, application of unclean hands rests within the sound discretion

---

[8] Plaintiffs also argue that the declaratory judgment relief they seek is legal in nature and therefore cannot be barred by the doctrine of unclean hands. (Pls.' Opp'n Br. 2, 11-12.) Plaintiffs' argument on this point, however, is not persuasive because the declaratory relief request is accompanied by a request for injunctive relief. *See AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 223-24 (3d Cir. 2009) (holding that if a declaratory judgment action "is the counterpart of a suit in equity," the matter is equitable in nature); *Amgen Inc. v. Hospira, Inc.*, No. 15-839, 2016 WL 4183748, at *3 (D. Del. Aug. 5, 2016) (stating that "[w]here, as here, '[a] declaratory judgment action seek[s] . . . injunctive relief, [it] is clearly equitable in nature'" (second, third, and fourth alterations in original) (citation omitted)); *Gaudiosi v. Mellon*, 269 F.2d 873, 875, 879, 881 (3d Cir. 1959) (noting "conduct constituted the 'unclean hands' which barred [plaintiff's] prayers for equitable relief[,]" including a declaratory judgment).

11

of the trial court."[9] *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999) (citing *Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 855 (3d Cir. 1984)).

Under Third Circuit precedent, "the primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, *i.e.*, have a relationship, to the matters before the court for resolution." *Id.* Thus, the doctrine "applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001) (quoting *Keystone*, 290 U.S. at 245). This "requires an 'immediate and necessary' relationship between the claims at issue." *In re New Valley Corp.*, 181 F.3d at 526 (citing *Keystone*, 290 U.S. at 245); *see also Highmark*, 276 F.3d at 174 ("The nexus 'between the misconduct and the claim must be close.'" (citation omitted)).

Here, the Court finds that the conduct giving rise to Plaintiffs' claims is not "immediate[ly] and necessar[il]y" related to Plaintiffs' illegal conduct. *See In re New Valley Corp.*, 181 F.3d at 525. Rather, the relief Plaintiffs seek stems from the LPA requirement under the CREAMM Act and whether that LPA requirement is preempted by the NLRA. (*See* Compl., Prayer for Relief 22-23.) As Plaintiffs argue, the alleged wrongdoing Defendants identify—"operating in a business regulated by state law but illegal under the [Controlled Substance Act ('CSA')]"—is collateral to the LPA requirement at issue. (Pls.' Opp'n Br. 8.) In fact, the LPA does not directly give Plaintiffs the ability to operate in the cannabis industry and, as a result, violate federal law, as Defendants

---

[9] Moreover, it is within the court's discretion "to limit the reach of the doctrine to only some of the claims." *In re New Valley Corp.*, 181 F.3d at 525; *see also Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244 (1933) (explaining when a "plaintiff is shown to have come with unclean hands in respect of only one of [the claims], the others will not be dismissed").

contend. (*See generally* LPA.) The agreed-upon 2022 LPA also does not mention cannabis except for the "UFCW" logo which reads "Cannabis Workers Rising." (*See id.*)

Moreover, the cases that Defendants rely upon are readily distinguishable. For example, in *Ctrl Alt Destroy v. Elliott*, No. 24-753, 2025 WL 790963 (S.D. Cal. Mar. 12, 2025), the Southern District of California tackled a similar issue regarding whether a cannabis-retailer's complaint seeking to enjoin a state's LPA requirement is barred by the unclean hands doctrine. *Id.* at *5-7; (*see also* Defs.' Moving Br. 13-14 (analogizing *Ctrl Alt Destroy*); Defs.' Reply 4-5, 7 n.6 (same).) The court in that case granted the defendant's motion to dismiss, and "decline[d] to use its equitable power to encourage participation in activities that Congress has expressly prohibited" where plaintiff came to the court with unclean hands because its business "exist[ed] solely for the purpose of making money through repeated and ongoing violations of federal law." *Ctrl Alt Destroy*, 2025 WL 790963, at *5-6, *8 (quotation marks and citation omitted). The Third and Ninth Circuits, however, apply different tests for unclean hands.[10] *Compare Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) (noting Ninth Circuit's unclean hands test "requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and 'weigh[ing] the substance of the right asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose that right'" (alterations in original) (citation omitted)), *with In re New Valley Corp.*, 181 F.3d at 523 (noting Third Circuit's unclean hands doctrine requires "that

---

[10] Additionally, on appeal in *Ctrl Alt Destroy*, the defendant disavowed the district court's reasoning, stating that "the proper disposition would be for the [c]ourt to vacate and remand for further proceedings including . . . factual development on the unclean hands doctrine." Answering Br., *Ctrl Alt Destroy, Inc. v. Elliot*, Case No. 25-2419, Dkt. No. 41.1 at 16 (9th Cir. Mar. 4, 2026). The Court notes that if the district court's decision in *Ctrl Alt Destroy* is vacated and remanded for further "factual development," the Ninth Circuit's balancing test for unclean hands would apply. *See Northbay Wellness Grp.*, 789 F.3d at 960.

there be an 'immediate and necessary relationship' between the conduct and the matters in litigation" (citation omitted)).

Additionally, in *Apical Biotek, LLC v. Maitri Holdings, LLC*, No. 25-1396, 2026 WL 177927 (3d Cir. Jan. 22, 2026), a case flagged in Defendants' notice of supplemental authority (*see* Defs.' Apr. 3, 2026, Not. of Supp. Auth.), the Third Circuit addressed an appeal of a motion for summary judgment on breach of contract and unjust enrichment claims where "the contract at issue may involve conduct that violates federal law[.]" *Apical Biotek*, 2026 WL 177927, at *1. In its analysis, the Third Circuit made clear that if a business "cultivates, manufactures, or distributes a federally controlled substance, then claims based on a contract to provide such . . . services should be dismissed because enforcement would require th[e] [c]ourt to 'stamp its approval on the parties' unlawful activities[.]'" *Id.* at * 2 (quoting *CCH Acquisitions, LLC v. J&J&D Holdings LLC*, No. 23-2983, 2025 WL 601249, at *6 (S.D. Ohio Feb. 25, 2025)). That case, however, is distinct from the facts here. This matter does not involve a contract "that contemplates distribution of a controlled substance in violation of federal law[,]" and instead concerns whether a labor requirement (the LPA) is preempted by federal labor law.[11] *Apical*, 2026 WL 177927, at *1; (*see* Compl., Prayer for Relief 22-23; LPA.)

The Court will not accept Defendants' invitation to stretch the limitations of the doctrine of unclean hands under Third Circuit precedent. *See, e.g., Keystone*, 290 U.S. at 245 (noting that courts "do not close their doors because of plaintiff's misconduct . . . that has no relation to anything involved in the suit, but only for such violations of conscience . . . [that] affect the

---

[11] Defendants also note that Curaleaf recently filed a brief in the Sixth Circuit arguing that "'courts cannot issue orders that facilitate illegal activity, namely violations of the CSA.'" (Defs.' Reply Br. 2 (quoting Defendants-Appellants' Br., *Hello Farms Licensing MI, LLC v. CURA MI, LLC*, Case No. 25-1759, Dkt. No. 19 at 30-34 (6th Cir. Nov. 6, 2025)).)

equitable relations between the parties" with respect to "something brought before the court for adjudication"). To be sure, the Court recognizes that the *collateral conduct* that Plaintiffs engage in concerns distribution of a controlled substance in violation of the CSA. (*See, e.g.*, Compl. ¶ 18 ("Curaleaf is one of the world's premiere cannabis companies and a leading provider of cannabis" with multiple cannabis facilities.).) What is squarely at issue in this case, however, is whether the LPA requirement under the CREAMM Act is in violation of federal labor law, and the Court fails to see how that issue has a sufficient nexus to the federally-illegal conduct to warrant the application of the unclean hands doctrine here. The Court, accordingly, declines to apply the unclean hands doctrine to Plaintiffs' claims. *See Scherer Design Grp.*, 764 F. App'x at 153 (finding that district court "did not abuse its discretion in declining to apply the unclean hands doctrine to deny [plaintiff's] request for equitable relief" where the "allegedly unclean conduct is not directly related to [d]efendants' breach of the duty of loyalty" at issue); *but see Apical*, 2026 WL 177927, at *3 (Matey, J., concurring) (noting that "if . . . the case and controversy *turns on* controlled substances, a prompt dismissal" is required (emphasis added)).

### 2.    *Abstention*

Defendants next argue that the Court should abstain under both the *Younger* and *Burford* abstention doctrines. (*See* Defs.' Moving Br. 15-20.) Plaintiffs argue that abstention is not appropriate here. (*See* Pls.' Opp'n Br. 12-15.)

To begin, the Court notes that "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). "Parallel state-court proceedings do not detract from that obligation." *Id.* Exceptions to that general rule, including those under the *Younger* and *Burford* abstention doctrines, however, do exist. *See generally*

15

*Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). The Court addresses each of these abstention doctrines below.

### a.    *Younger* Abstention

Under the *Younger* abstention doctrine, "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of New Orleans* ("*NOPSI*"), 491 U.S. 350, 368 (1989) (citations omitted). Such "exceptional circumstances" exist in three types of proceedings: (1) "federal intrusion into ongoing state criminal prosecutions"; (2) "civil enforcement proceedings"; and (3) "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Sprint*, 571 U.S. at 78 (alteration in original) (citations omitted).

Here, the Court finds that abstention under *Younger* is not appropriate. Defendants contend that the pending underlying state matter "qualifies as a 'civil enforcement proceeding' involving the would-be federal plaintiff—that is, Curaleaf." (Defs.' Moving Br. 16.) Defendants, however, overlook the fact that "not all state civil enforcement proceedings are treated equally, nor do all require federal abstention." *Gonzalez v. Waterfront Comm'n of N.Y. Harbor*, 755 F.3d 176, 180-81 (3d Cir. 2014). Rather, "abstention generally is appropriate only where the state civil enforcement proceeding is akin to a criminal prosecution in important respects."[12] *Id.* at 180 (quotation marks omitted) (quoting *Sprint*, 571 U.S. at 79).

_____

[12] Such "important respects" include "several distinguishing features": (1) "[t]hey are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act"; (2) "[a] state actor is routinely a party to the state proceedings and often initiates the action"; and (3) "they often begin with internal investigations that culminat[e] in the filing of a formal complaint or charges." *Gonzalez*, 755 F.3d at 181 (third alteration in original) (quotation marks omitted) (quoting *Sprint*, 571 U.S. at 79-80).

The Court recognizes that there is a pending proceeding in front of the New Jersey Office of Administrative Law regarding the "imposition of [a] civil monetary penalty in the amount of $610,000." (*See* Ex. 1 to Defs.' Moving Br., ECF No. 39-2.) That proceeding, however, does not resemble the type of quasi-criminal proceeding contemplated under the *Younger* doctrine, because, among other things, "there is [no] close relationship between the underlying administrative . . . proceeding and any analogous state criminal law." *McNamara v. Grewal*, No. 19-173, 2019 WL 8261868, at *5 (D.N.J. Oct. 29, 2019) ("After all, the 'civil enforcement' must be 'quasi-criminal' in nature." (citation omitted)). In light of the Supreme Court's "dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule[,]'" the Court finds that abstention under *Younger* is not appropriate. *Sprint*, 571 U.S. at 81-82 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)); *see also NOPSI*, 491 U.S. at 373 ("But there is no doctrine that the availability or even the pendency of state judicial proceedings excludes federal courts.").

### b.    *Burford* Abstention

"The purpose of *Burford* is to avoid federal intrusion into matters of local concern and which are within the special competence of local courts." *Matusow v. Trans-Cnty. Title Agency, LLC*, 545 F.3d 241, 247 (3d Cir. 2008) (quotation marks omitted) (quoting *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 303-04 (3d Cir. 2004)). "*Burford* is concerned with protecting complex state administrative processes from undue federal interference, [but] it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *NOPSI*, 491 U.S. at 362 (citation omitted). In analyzing whether abstention is appropriate under this doctrine, the Third Circuit instructs courts to consider a two-step analysis: (1) "whether timely and adequate state law review is available"; and

17

(2) whether "the case . . . involves difficult questions of state law impacting on the state's public policy or whether the district court's exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." *Matusow*, 545 F.3d at 247-48 (alteration in original) (quotation marks and citations omitted).

The Court similarly finds that abstention under *Burford* is not appropriate here. Defendants argue that the Court should also abstain under *Burford* because both steps are satisfied and because "the cannabis licensing framework epitomizes the kind of complex, technical regime that *Burford* protects." (Defs.' Moving Br. 18-19.) The matter here, however, does not involve "difficult questions of state law or implicate any complex state policies" that are contemplated by the *Burford* abstention doctrine. *Matusow*, 545 F.3d at 248. Rather, as Plaintiffs point out, "Curaleaf asks this Court to apply settled NLRA preemption principles . . . and enjoin enforcement of one provision of state law." (Pls.' Opp'n Br. 13.) The Court will, therefore, not abstain under *Burford*. *See McNamara*, 2019 WL 8261868, at *7 ("*Burford* has no application when the Court is called upon . . . to interpret uncomplicated state statutes that are intertwined with federal laws.").

Defendants' motion is, accordingly, denied.

**B.     Plaintiffs' PI Motion**

Because the Court denies Defendants' Motion to Dismiss, the Court now turns to Plaintiffs' PI Motion. In their motion, Plaintiffs seek to:

> enjoin Defendants from imposing any penalties, licensing consequences, or other adverse actions for Curaleaf's alleged failure to enter into a[n] [LPA] or otherwise restricting Curaleaf's engaging in conduct protected under the [NLRA], including but not limited to the right to resort to economic weapons, to speak about issues related to unionization, to refuse access to its property, and to insist on a secret-ballot election according to the procedures established by federal law.

(PI Mot. 1-2.) Plaintiffs argue that they "face[] imminent and irreparable harm" including "fines [Curaleaf] cannot recover from the state, the loss of [Curaleaf's] licenses (including the license for its Bordentown facility, effective October 31, 2025), and permanent harm to [their] business." (Pls.' Moving Br. 2, ECF No. 23-1.) For the reasons discussed below, the Court denies Plaintiffs' PI Motion.

### 1.    *Likelihood of Success on the Merits*

The Court first turns to whether Plaintiffs have shown a likelihood of success on the merits that the NLRA preempts the LPA requirement. *See Issa*, 847 F.3d at 131. As a preliminary matter, the Court starts its analysis of the PI Motion by providing an overview of the NLRA and the applicable preemption doctrines, before turning to its preemption analysis.

### a.    NLRA and Preemption Standards

"Passed in 1935, the NLRA 'encourag[es] the practice and procedure of collective bargaining' between labor and management to resolve 'industrial disputes arising out of differences as to wages, hours, or other working conditions.'" *Davis v. Benihana, Inc.*, 772 F. Supp. 3d 524, 533 (D.N.J. 2025) (alteration in original) (quoting 29 U.S.C. § 151). Its purpose is to "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." *Grane Health Care v. NLRB*, 712 F.3d 145, 147 (3d Cir. 2013) (quoting 29 U.S.C. § 151). "Though the NLRA contains no express preemption provision," the Supreme Court "has carved out two distinct implied-preemption doctrines around the NLRA": (1) "*Garmon* preemption"; and (2) "*Machinists* preemption." *Hotel Emps. & Rest. Emps. Union, Loc. 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 211-12 (3d Cir. 2004); *see San Diego Bldg. Trades*

*Council v. Garmon* ("*Garmon*"), 359 U.S. 236, 245 (1959); *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n* ("*Machinists*"), 427 U.S. 132, 140 (1976).

*Garmon* preemption "forbids state and local regulation of activities that are 'protected by [Section] 7 of the [NLRA], or constitute an unfair labor practice under [Section] 8.'"[13] *Hotel Emps. & Rest. Emps.*, 390 F.3d at 211 (second alteration in original) (quoting *Garmon*, 359 U.S. at 245). Under *Garmon* preemption, "[s]tates may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits[,]" and, as a result, "the *Garmon* rule prevents [s]tates not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the [NLRA]." *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (citations omitted).

*Machinists* preemption "precludes state and municipal regulation concerning those aspects of labor-management relations that Congress intended 'to be controlled by the free play of economic forces.'" *Hotel Emps. & Rest. Emps.*, 390 F.3d at 212 (quoting *Machinists*, 427 U.S. at 140). "This form of preemption recognizes Congress's desire to balance the power between employers and workers." *Id.* As a result, "[s]tates are . . . prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes or lockouts, unless such restrictions presumably were contemplated by Congress." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614-15 (1986) (citation omitted).

---

[13] Section 7 details the rights of employees to organize and collectively bargain, and Section 8 details unfair labor practices. *See* 29 U.S.C. §§ 157, 158; *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 775 (2023) (summarizing NLRA Sections 7 and 8).

The Court further discusses the application of each preemption doctrine below,[14] but first turns to the threshold matter of whether the NLRA applies or arguably applies to the cannabis industry.

**b.      Application of the NLRA to the Cannabis Industry**

Before the Court can analyze whether the LPA requirement is preempted, it must consider whether the NLRA applies, *or arguably applies*, to the cannabis industry. *See Gould*, 475 U.S. at 286 (noting "that [s]tates may not regulate activity that the NLRA protects, prohibits, *or arguably protects or prohibits*" (emphasis added)). Defendants urge this Court to find that the NLRA does not apply because: (1) "there is no interstate trade in cannabis"; and (2) "the NLRA only reaches unfair labor practices 'affecting' *inter*state commerce, the statute does not apply to the *intra*state regulation and sale of cannabis in New Jersey at issue here." (Defs.' Moving Br. 23 (emphasis in original).) Plaintiffs, however, disagree, arguing that: (1) "[t]he NLRA's reach is broad" and "covers any activity that 'burdens or obstructs' commerce, including purely intrastate labor activity"; (2) "the NLRB has consistently asserted jurisdiction over cannabis workers and employers"; and (3) "Defendants' basic error is to conflate the cannabis product market with the labor market" even though "the two are distinct" and "the labor market is both fully lawful and fully regulated by federal law – specifically, by the NLRA." (Pls.' Opp'n Br. 23-25.)

"The NLRA is remarkably broad in scope and power." *FDLRST Media, LLC v. NLRB*, 35 F.4th 108, 119 (3d Cir. 2022). Moreover, the Supreme Court has "consistently declared that in passing the [NLRA], Congress intended to and did vest in the [NLRB] the fullest jurisdictional

---

[14] The Court notes that it need only determine that either *Garmon* or *Machinists* preemption applies in order to find that Plaintiffs have shown a likelihood of success on the merits. The Court, however, addresses both doctrines of preemption to provide a complete analysis.

breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963) (collecting cases).

Here, the Court finds that the NLRA's reach arguably extends and applies to cannabis businesses. *See Gould*, 475 U.S. at 286. In reaching this decision, the Court finds persuasive the fact that other courts have similarly found that the NLRA at least arguably applies to the labor market that exists within the cannabis industry.[15] *See, e.g.*, *Casala, LLC v. Kotek*, 789 F. Supp. 3d 1025, 1037-38 (D. Ore. 2025) (noting "support [for] the conclusion that the NLRA applies to the cannabis industry in a way that is not 'plainly contrary' to the NLRA's text and that has not been 'authoritatively rejected'" and finding that "the NLRA at least arguably applies to cannabis businesses"); *Absolute Healthcare v. NLRB*, 103 F.4th 61, 67 (D.C. Cir. 2024) (analyzing NLRB's decision regarding a medical marijuana dispensary's unfair labor practices); *see also* NLRB GC Advice Mem., Ne. Patients Grp. d/b/a Wellness Connection of Me., Case Nos. 01-CA-104979, 01-CA-106405, at 8 (Oct. 25, 2013) (determining that "a labor dispute involving the [cannabis] industry could have a substantial effect on interstate commerce" and noting that the NLRB "has the authority to regulate the marijuana industry, even where production and consumption is intended to be wholly intrastate").

Because the Court finds that the NLRA at least arguably applies to the cannabis industry, *see Garmon*, 359 U.S. at 245-46, it next turns to its *Garmon* preemption analysis.

---

[15] The Court further notes that courts have also found that other federal laws extend their reach to the workers and labor market within the cannabis industry. *See, e.g.*, *Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1110, 1113 (10th Cir. 2019) (finding employees of cannabis businesses are not "categorically excluded" from protections under the Fair Labor Standards Act); *Smith v. 116 S Mkt. LLC*, 831 F. App'x 355, 356 (9th Cir. 2020) (rejecting challenge that compliance with the Americans with Disabilities Act does not extend to businesses selling cannabis); *Casala*, 789 F. Supp. 3d at 1038 (noting that "the Occupational Safety and Health Administration ('OSHA') also has resolved cases involving cannabis processing and growing facilities" (citations omitted)).

### c.    *Garmon* Preemption

Plaintiffs argue that the LPA requirement is preempted under *Garmon* for multiple reasons, including because the LPA requirement: (1) forces employers to agree to an LPA; (2) "impermissibly intrudes upon th[e] exclusive federal domain [of uniform national labor policy], particularly in the areas of collective bargaining and union organizing, which are regulated solely by the NLRA"; and (3) "purports to layer on new penalties, including financial penalties and the loss of a license, for conduct otherwise governed by federal law." (Pls.' Moving Br. 8-20; Pls.' Opp'n Br. 17-18.) Defendants disagree, arguing that "Curaleaf does not dispute[,] . . . New Jersey has a deeply rooted interest in regulating a state-created cannabis market that remains federally illegal" and, as such, an exception to the *Garmon* preemption doctrine applies. (Defs.' Reply 19-23; Defs.' Moving Br. 2.)

*Garmon* preemption encompasses activity that the NLRA "arguably protects or prohibits" as it is "designed to prevent 'conflict in its broadest sense' with the 'complex and interrelated federal scheme of law, remedy, and administration.'" *Gould*, 475 U.S. at 286 (quoting *Garmon*, 359 U.S. at 243). "As the party asserting preemption, [Curaleaf] bears the burden of[:] (1) advancing an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been authoritatively rejected by the courts or the [NLRB;] and then (2) putting forth enough evidence to enable the court to find that the NLRA arguably protects [the complained of] conduct." *Glacier Nw.*, 598 U.S. at 779 (third alteration in original) (quotation marks omitted) (quoting *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 395 (1986)).

Here, Plaintiffs identify that the CREAMM Act makes the LPA requirement an ongoing material condition for a cannabis business to have a license. (*See* Pls.' Moving Br. 3, 6); N.J. Stat. Ann. § 24:6I-36. Without a valid LPA, Plaintiffs face suspension of their licenses and fines.

23

(*See, e.g.*, Compl. ¶ 47 (citing Ex. H to Compl.).) Moreover, as Plaintiffs note, the LPA requirement itself either "short-circuits" normal processes provided under the NLRA or "forces" negotiation over matters not required by Congress by, for example: (1) "denying Curaleaf the option to insist on a[n NLRB]-supervised election when employees seek representation" (Pls.' Moving Br. 14 (first citing Ex. I to Compl.; and then citing N.J. Stat. Ann. § 24-6I-36.c)); (2) "conditioning licensure on the execution of an LPA, . . . compel[ling] negotiation over a topic that federal law leaves optional and thus conflicts with federal labor policy" (*id.* at 15 (first citing N.J. Stat. Ann. § 24-6I-36.c; then citing 29 U.S.C. § 158(d); and then citing *520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1134 (7th Cir. 2008))); and (3) "forc[ing] Curaleaf to surrender other rights in the collective bargaining process" (*id.*). As such, Plaintiffs have shown that the LPA requirement "impermissibly conditions a state license on an employer 'refraining from conduct protected by federal labor law,' which 'chills one side of the "robust debate which has been protected under the NLRA."'" *Casala*, 789 F. Supp. 3d at 1039 (quoting *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 73 (2008)). The Court finds that Plaintiffs have shown that *Garmon* preemption applies. *See id.* (noting party "met its burden on the merits of *Garmon* preemption").

The Court's inquiry cannot stop there, however, because, even if a party has met its burden in showing that *Garmon* preemption applies, there are exceptions to the rule in certain cases. *See Garmon*, 359 U.S. at 243-44. These carved out exceptions for which "preemption is inappropriate" include: (1) "when a state law relates to a 'merely peripheral concern of the [NLRA]'[;] or [(2)] when it 'touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [a court] could not infer that Congress had deprived the States of the power to act.'" *Davis*, 772 F. Supp. 3d at 535 (first, fourth, and fifth alterations in

original) (quoting *Garmon*, 359 U.S. at 243-44). For a court to evaluate the latter exception—the "local interest" exception—it must "first determine if adjudicating the state law claims would present a 'risk of interference with the regulatory jurisdiction of the [NLRB]" and then "determine whether the state law regulates 'a significant state interest' 'so deeply rooted in local feeling and responsibility.'" *Id.* at 535-36 (citations omitted). "What the Supreme Court had in mind [for this local feeling exception] and specifically considered were state laws regulating 'conduct marked by violence and imminent threats to the public order.'"[16] *Id.* at 548 (quoting *Garmon*, 359 U.S. at 247).

Defendants argue that the local interest exception: (1) "defeats Curaleaf's claim because [the LPA] requirement protects interests 'deeply rooted in local feeling and responsibility' by ensuring that cannabis licensees in a federally illicit market engage with bona fide labor organizations" (Defs. Moving Br. 2); and (2) applies because "th[e] States may keep the peace through regulation in the very industries they have chosen to legalize but the federal government has not[,]" (*id.* at 28). The Court, however, finds that the LPA requirement under the CREAMM Act is not related to violence or threats of violence which would make the local feeling exception applicable. Instead, the CREAMM Act was "designed to eliminate the problems caused by the unregulated manufacturing, distribution, and use of illegal marijuana within New Jersey[.]" N.J.

---

[16] In fact, in the cases since *Garmon*, the Supreme Court:

> has only applied the local interest exception "in cases where the conduct alleged concerned activity traditionally recognized to be the subject of local regulation, most often involving threats to public order such as violence, threats of violence, intimidation and destruction of property[,]" . . . cases involving trespass on private property[,] and "certain personal torts . . . ."

*Davis*, 772 F. Supp. 3d at 548 (collecting cases).

25

Stat. Ann. § 24:6I-32c. Further included in the CREAMM Act's reasoning was that "[c]ontrolling and legalizing cannabis . . . will free up precious resources to allow [the state's] criminal justice system to focus on serious criminal activities and public safety issues" as well as "strike a blow at the illegal enterprises that profit from New Jersey's current, unregulated illegal marijuana market[.]" N.J. Stat. Ann. §§ 24:6I-32g, 24:6I-32h.

Defendants also assert that "[b]efore [the] CREAMM[ Act], cannabis enterprises operated unlawfully and without regulatory oversight, resulting in violence, exploitation of vulnerable workers, and threats to the public." (Defs.' Reply Br. 19.) This assertion, however, is neither supported by citations to case law (*see generally* Defs.' Reply Br.), nor supported by the "[l]egislative findings and declarations relating to regulation of cannabis for personal use" detailed in the CREAMM Act itself, *see* N.J. Stat. Ann. § 24:6I-32. The Court, therefore, finds that the CREAMM Act does not regulate "conduct marked by violence and imminent threats to the public order[,]" and is therefore not subject to the *Garmon* local feeling exception. *Garmon*, 359 U.S. at 247 (citations omitted); *see also Casala*, 789 F. Supp. 3d at 1040 (finding local feeling exception does not apply in cannabis-related matter).

The Court, accordingly, finds that *Garmon* preemption applies, and next turns to *Machinists* preemption.

### d.    *Machinists* Preemption

As both Defendants and Plaintiffs recognize, the *Machinists* doctrine "rests on the premise that Congress intentionally left certain aspects of labor-management relations 'unregulated,' to be 'controlled by the free play of economic forces.'" (Defs.' Moving Br. 23 (quoting *Machinists*, 427 U.S. at 140); *see also* Pls.' Moving Br. 10 ("In the NLRA, Congress intentionally left parties free to resolve labor disputes by resorting to so-called economic weapons – strikes, lockouts, and other

work stoppages.").) Plaintiffs argue that "the LPA requirement undermines the federal system in two ways": (1) "it forces employers into negotiations over a permissive subject – the LPA itself"; and (2) it "restricts a party's resort to economic weapons even though they are considered to be a part of the natural collective bargaining process." (Pls.' Opp'n Br. 19 (citation omitted).) Plaintiffs contend that by signing an LPA, they give up their right "to resort to weapons such as contracting out work or locking out employees" and "[t]he [U]nion in turn, gives up its right to disrupt the employer's business with tactics like picketing and other protests." (*Id.*) Such an LPA requirement, according to Plaintiffs, "tilts the field and frustrates Congress's design." (*Id.*) The Court agrees.

The LPA requirement at issue provides Defendants "with the assurance that, should an entity [such as Plaintiffs] be licensed, its operations will not be shut down due to labor-dispute or labor-related work stoppages." (Ex. I to Compl. 4-5, ECF No. 1.) As a result, although the term itself is not defined, such an agreement clearly requires Curaleaf to give up the right to utilize economic weapons. (*See id.*) The right to "[r]esort to economic weapons should more peaceful measures not avail" and "the use of economic pressure by the parties to a labor dispute is . . . part and parcel of the process of collective bargaining[,]" and the state may not prohibit the parties' ability to use such weapons. *Machinists*, 427 U.S. at 144, 147, 149 (alterations in original) (first quoting *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 317 (1965); and then quoting *NLRB v. Ins. Agents' Int'l Union, AFL-CIO*, 361 U.S. 477, 495 (1960)). Defendants, in "conditioning license renewal on signing an LPA, . . . seek[] to regulate the relationship between unions and employers. This upsets the balance Congress struck in passing the NLRA." *Casala*, 789 F. Supp. 3d at 1041 (finding measure requiring licensee to sign an LPA preempted under *Machinists*).

Moreover, the Court is not persuaded by Defendants' argument that "there is nothing 'unregulated' about a market that federal law bans" and, as a result, "there is no plausible claim

that Congress meant to keep the cannabis industry free from state regulation." (Defs.' Moving Br. 32; *see also id.* at 33 (arguing that "*Machinists* preemption does not apply [to the LPA] because Congress has clarified that it does not intend to leave the cannabis industry 'to be controlled by the free play of economic forces'") (quoting *Ctrl Alt Destroy*, 2025 WL 790963, at *7 n.8)).) "[T]he balancing that *Machinists* seeks to protect refers only to the *labor relations* context, not to regulation of the underlying market. [Therefore,] [t]he 'balance of power designed by Congress' in labor relations has no effect on Congress's ban on cannabis." *Casala*, 789 F. Supp. 3d at 1041 (emphasis in original) (rejecting defendants' argument relying on *Ctrl Alt Destroy* to reach the opposite conclusion). Additionally, although Congress declared cannabis federally illegal, federal law has been applied many times to workers and the labor market within the cannabis industry. *See, e.g., Casala*, 789 F. Supp. 3d at 1038 (collecting cases).

The Court, accordingly, finds that the LPA requirement is preempted under *Machinists*, as well as *Garmon*, and that Plaintiffs have therefore shown a likelihood of success on the merits. The Court next turns to its analysis of whether Plaintiffs have shown a likelihood of irreparable harm.

### 2.    *Likelihood of Irreparable Harm*

"A plaintiff seeking a preliminary injunction must prove irreparable harm is 'likely' in the absence of relief." *Issa*, 847 F.3d at 142 (citation omitted). "[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117-18 (3d Cir. 2013) (alteration in original) (citation omitted). "Delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action." *Id.* at 118 (alteration in original) (citation omitted).

28

Here, Plaintiffs contend that, absent a preliminary injunction, they will be irreparably harmed because: (1) without a new LPA, "Curaleaf would be forced to cease operations at the dispensary"; (2) "the LPA requirement will continue to interfere with Curaleaf's rights under the NLRA, including its right to refuse to bargain over optional subjects, to decline to bargain with a union not properly certified by the NLRB or designated by employees, and to exercise economic weapons if it chooses"; and (3) Defendants have imposed "$610,000 in fines on Curaleaf for failing to secure an LPA and under the Eleventh Amendment, those funds cannot be recovered once paid into the state treasury and would be irretrievably lost[.]" (Pls.' Moving Br. 22.)

As Defendants note, however, there is a lack of urgency in Plaintiffs' request for a preliminary injunction. (*See* Defs.' Moving Br. 35-38.) The CREAMM Act was enacted in 2021, and Plaintiffs have held several licenses in New Jersey since at least April of 2022. (Compl. ¶¶ 22-23, 36.) To initially comply with the licensing regime under the CREAMM Act, Curaleaf signed an LPA in 2022, but that LPA expired in April 2025. (*Id.* ¶¶ 2, 25, 43.) Defendants subsequently issued a Violation Notice to Curaleaf in May 2025 (*id.* ¶ 45), and followed up in August 2025 with an Enforcement Notice imposing a $610,000 penalty (*id.* ¶ 47). It was not until October 9, 2025, however, that Plaintiffs filed their Complaint and subsequently sought a preliminary injunction two weeks later.[17] (*See generally id.*; PI Mot.) Such an unexplained[18] and

---

[17] The Court recognizes that in late September 2025, the Commission "provisionally granted" Curaleaf's application to renew its license, subject to confirmation that Curaleaf secured an LPA. (*See* Compl. ¶ 50.) Notably, however, by this point, Curaleaf had already been aware of its LPA violation for months, was warned of consequences related to not fulfilling the LPA requirement, and had been fined. (*See id.* ¶¶ 2, 45, 47.)

[18] Curaleaf does not address in reply why the delay is excusable here. (*See generally* Pls.' Reply Br.); *H-1 Auto Care, LLC v. Lasher*, No. 21-18110, 2022 WL 13003468, at *4 (D.N.J. Oct. 21, 2022) (finding that plaintiff failed to "make the requisite showing of irreparable harm" where "[p]laintiff [made] no effort in its briefing to explain why it did not act sooner").

"tremendous delay" of multiple months (*see* Defs.' Moving Br. 35), shows a lack of urgency on Plaintiffs' behalf, *see Lanin*, 515 F. App'x at 117-18. The Court finds that this alone is fatal to Plaintiff's PI Motion and is reason for the Court to find no irreparable harm.[19] *See, e.g., Messina v. Coll. of N.J.*, 566 F. Supp. 3d 236, 249 (D.N.J. 2021) ("[A]ny purported harm [p]laintiffs may face is a consequence of their own delay because they waited over four months to request injunctive relief." (citations omitted)); *H-1 Auto Care*, 2022 WL 13003468, at *4 ("Many courts have found that a delay of just weeks or months precludes a showing of irreparable harm." (citing *Logic Tech. Dev. LLC v. Levy*, No. 17-4630, 2021 WL 3884287, at *3 (D.N.J. Aug. 31, 2021))); *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) ("[T]here is an unexplained delay of two months in presenting a cease and desist letter, and another unexplained delay of five months in moving for injunctive relief. Under these circumstances, plaintiffs' delay, alone, precludes a finding of irreparable harm . . . ."); *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 383 (D.N.J. 2002) (noting that a lengthy delay "knocks the bottom out of any claim of immediate and irreparable harm" (citation omitted)).

The Court, accordingly, finds that Plaintiffs have not met their burden of establishing irreparable injury that warrants a preliminary injunction.[20] Plaintiffs' PI Motion is denied.

---

[19] The Court also notes that any resulting injury is a result of Plaintiffs' own actions, notably their willing choice to delay bringing this issue to the Court, which does not constitute the type of irreparable injury required under the preliminary injunction standard. *See, e.g., Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable." (citation omitted)).

[20] The Court need not reach the remaining two factors in the preliminary injunction analysis. *See In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) ("[I]f the movant does not make the requisite showings on either of these [first] two factors, the [ ] inquiry into the balance of harms [and the public interest] is unnecessary, and the stay should be denied without further analysis.'" (second, third, and fourth alterations in original) (citation omitted)).

## IV.    CONCLUSION

For the reasons set forth above, the parties' motions are denied. The Court will issue an

Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: May 27th, 2026

31